# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JENNIFER BLETZ, | No. 4:20-CV-01524 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| WEGMANS FOOD MARKETS, INC., | |
| Defendant. | |

## MEMORANDUM OPINION

### SEPTEMBER 7, 2022

Jennifer Bletz sued Wegmans Food Markets in August 2020, alleging violations of the Americans with Disability Act and the Pennsylvania Human Relations Act. Bletz's suit, which seeks to recover damages associated with her loss of roughly four months paid part-time work, claims that Wegmans unlawfully put her on unpaid leave when a shoulder injury left her unable to perform her usual duties in the frozen foods department. After careful consideration, however, I find her theory untenable. Wegmans' motion for summary judgment is therefore granted.

## I.    FACTS

Bletz started a second, part-time job at Wegmans' State College, Pennsylvania location to earn extra money to support her family in November 2015, after her primary employer, a salon, reduced its hours of operation.[1] She started out as a

---

[1]    Doc 19. ¶ 2; Doc. 25 ¶ 2; *see also* Doc. 25-1 at 24:5–25:11.

cashier, before transferring to the service desk in 2016.[2] And later, in July 2017, she moved to a customer service position in the frozen foods department.[3] Today's action, however, centers on a shoulder ailment that Bletz began to suffer from just a few months after this last move.[4]

While the pain began in September 2017, at first, Bletz's work was not impacted.[5] It was not until January 22, 2018, that Bletz first called off work for shoulder pain.[6] But later that day, she provided Wegmans' employee advocate, Toby Klein, with a note from her doctor that stated: "Please excuse Jennifer A Bletz for a doctor's appointment today. No lifting with L arm at this point. MRI has been ordered to further evaluate her injury."[7]

Although the note directed her not to lift with her left arm, Bletz told Klein that while "[she] couldn't do the overhead lifting that [her] job required in the Frozen Department," she "could still work."[8] The parties dispute (and Bletz offers contradictory testimony about)[9] whether she then told Klein that she wanted to wait until after her MRI to return—with Bletz now contending that Klein wanted to wait, while she was ready to return to paid work that did not require overhead lifting.[10] In

---

[2]    Doc. 19 ¶ 3; Doc. 25 ¶ 3.
[3]    Doc. 19 ¶ 4; Doc. 25 ¶ 4.
[4]    Doc. 23 at 2.
[5]    *Id.*
[6]    Doc. 19 ¶ 17; Doc. 25 ¶ 17.
[7]    Doc 19-3 at 2; Doc. 19 ¶ 18; Doc. 25 ¶ 18.
[8]    Doc. 25-1 at 59:17–22.
[9]    *Compare* Doc. 25-1 at 64:13–19 *with id.* at 68:4–9.
[10]   Doc. 19 ¶ 27; Doc. 25 ¶ 27.

any case, despite Bletz's claims about her capability, Klein sent her paperwork explaining how she could apply for short term disability benefits, Family Medical Leave Act leave, and continued employment leave under Wegmans' policy.[11] Ultimately, Bletz did not apply for short term disability; but Wegmans granted her continued employment leave, which allowed Bletz to remain employed, though without pay, until she could again work.[12] So while Bletz returned to work at the salon a week later (though performing administrative tasks instead of her usual styling duties) she was not scheduled to work at Wegmans in the weeks that followed.[13]

After her MRI in early February 2018, which led to a shoulder impingement and bone spurs diagnosis just a few weeks later, Bletz again presented Klein with a doctor's note.[14] The note once more directed, "No lifting with L arm at this point," and said that she would be seen again in three weeks.[15] And after this follow-up appointment, Bletz returned with another note for Klein.[16] This time, the note stated, "Patient is unable to return to work, will follow up in 6 weeks."[17] Bletz nonetheless remained adamant that she could work, just not in frozen foods.[18] Believing that

---

[11]   Doc. 19 ¶ 23; Doc. 25 ¶ 23.
[12]   Doc. 19 ¶¶ 24–25; Doc. 25 ¶¶ 24–25.
[13]   Doc. 19 ¶ 28; Doc. 25 ¶ 28.
[14]   Doc. 19 ¶¶ 29–30, 34; Doc. 25 ¶¶ 29–30, 34.
[15]   Doc. 19 ¶¶ 34–35; Doc. 25 ¶¶ 34–35.
[16]   Doc. 19 ¶¶ 36–37; Doc. 25 ¶¶ 36–37.
[17]   Doc. 19 ¶ 37; Doc. 25 ¶ 37.
[18]   Doc. 19 ¶ 38; Doc. 25 ¶ 38.

Bletz was having trouble understanding her restrictions, Klein copied the Wegmans frozen foods position description and gave it to Bletz for her doctor's review.[19] What's more, at least in Bletz's telling, Klein also told her that she pass along the information to Jon Malcos, a Wegmans recruiter, who would look to see if there were any available positions that fit her limitations.[20]

Two weeks later, on March 23, Bletz returned with another doctor's note; it stated that Bletz would be reevaluated on April 20, 2018 and included an attached annotated copy of the frozen foods position.[21] In her doctor's view, she could not meet the requirements to lift 50 pounds occasionally-to-frequently or 8–32 pounds on average; she could not use a box cutter, u-cart, hand/power jack, compactor, or paler; and she could only perform minimal upper extremity repetition, with no overhead lifting at all.[22]

Perhaps prompted by a note from Wegmans confirming that she was on continued employment leave until April 20, Bletz email Malcos.[23] That morning, she wrote, "I haven't heard anything from you regarding jobs available with my medical limitations. I assume there isn't anything. I wanted to check in and was curious about maybe a position in pricing."[24] A few hours later, Malcos answered, "I just took a

---

[19]   Doc. 19 ¶¶ 41–42; Doc. 25 ¶¶ 41–42.
[20]   Doc. 25-1 at 80:23–81:18.
[21]   Doc. 19 ¶ 44; Doc. 25 ¶ 44.
[22]   Doc. 19-7 at 3.
[23]   Doc. 19 ¶¶ 48–49; Doc. 25 ¶¶ 48–49.
[24]   Doc. 19-11 at 1.

look at your last set of restrictions you dropped off. It looks like you have a follow up scheduled for 4/20/18. Do you think they will release you to work in Frozen again? We don't currently have an opening in pricing. Is there anywhere else you are interested in?"[25] Shortly after, Bletz replied, "I am sorry, is this the first time you saw it? Or heard about my restrictions? I just handed it in 3 weeks ago. Toby said that once I get it to her she will give you the info so you can see what is available."[26] In response, Malcos wrote, "No I haven't seen them before. I am currently at a career fair but I would be happy to discuss the current openings with you. Would you like me to call you at 5pm today?"[27] Bletz, however, replied, "I will not be available at 5. I was checking in. We might as well wait until my appt on the 20th because at Physical therapy today surgery was mentioned. Will let you know what doctor says."[28]

At Bletz follow-up appointment, it was determined that she would need surgery.[29] Shortly after, she e-mailed Klein, saying that her surgery was scheduled for May 25 and that she was disappointed the lack of effort Klein and Malcos put into finding her a position—emphasizing that she had been able to work the entire time, just with limitations for her shoulder.[30] Klein responded, first apologizing for

---

[25] *Id.*
[26] *Id.* at 2.
[27] *Id.*
[28] *Id.*
[29] Doc. 19 ¶ 57; Doc. 25 ¶ 57.
[30] Doc. 19-13 at 1–2.

Bletz's disappointment, before then saying, "It is not Jon's [Malcos] job to find you another position, he is a recruiter. I looked again at your restrictions. There is nothing we have here at the store that does not involve lifting. If you have updated restrictions, please share them with me."[31] Two days later, Bletz's responded, tendering her resignation: "This is my resigning notification. I have accepted a position at Penn State. Next time I am at Wegmans I will bring in my clothes and equipment."[32]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] That this case includes cross-motions for summary judgment does not alter the calculus.[34] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[35] A defendant

---

[31]   *Id.*

[32]   *Id.*

[33]   Fed. R. Civ. P. 56(a).

[34]   *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.").

[35]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

"meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[36] But to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[37]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[38] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[39] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[40] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[41]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[42] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[43] Moreover, "[i]f a party fails to properly support an assertion of

---

[36] *Clark*, 9 F.3d at 326.
[37] *Id.*
[38] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[39] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[40] *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).
[41] *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694–95 (3d Cir. 1988)).
[42] *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[43] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[44] Finally, although this Court "need consider only the cited materials, . . . it may consider other materials in the record."[45]

## III.   ANALYSIS

To establish a prima facie case of disability discrimination under the Americans with Disabilities Act and the Pennsylvania Human Relations Act, employees must show that "(1) [they are] a disabled person within the meaning of the [Americans with Disabilities Act]; (2) [they are] otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [they have] suffered an adverse employment decision as a result of discrimination."[46] And when "a claim stem[s] from an employer's failure to accommodate an employee's disabilities . . . the relevant adverse employment action is the employer's 'refusal to make reasonable accommodations for an employee's disabilities.'"[47] Employees "can only show that [their] employer 'breached its duty

---

[44]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[45]   Fed. R. Civ. P. 56(c)(3).

[46]   *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010) ("the same legal standard that applies to the ADA applies equally to disability discrimination claims under the PHRA").

[47]   *Fowler v. AT & T, Inc.*, 19 F.4th 292, 306–07 (3d Cir. 2021).

to provide reasonable accommodations' if [they] 'could have been reasonably accommodated but for the employer's lack of good faith."[48]

Geisinger contends that Bletz has failed to show that she could perform the essential functions of her job, with or without a reasonable accommodation.[49] This claim requires that I first delineate the "essential functions" of the Wegmans frozen foods department job. From there, I must assess Bletz's ability to perform each task. And finally, should there be a task that she could not perform, I am then required to determine whether she could have done so with a reasonable accommodation.

Though the ultimate burden at the prima facie stage lies with employees, employers bear the burden of showing that function is "essential"—not "marginal."[50] "A job function may be considered essential for a number of reasons, including because (1) 'the reason the position exists is to perform that function,' (2) only a limited number of employees are available 'among whom the performance of that job function can be distributed,' or (3) the function is 'highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the

---

[48]    *Id.* at 307.
[49]    Wegmans also contends that Bletz has failed to show that it did not act in good faith during the interactive process. *See* Doc. 20 at 12–17; Doc. 26 at 11–12. Because Bletz cannot show that she could perform an essential function of the position, even with a reasonable accommodation, I decline to weigh-in on this argument.
[50]    *Supinski v. United Parcel Serv., Inc.*, 413 Fed. App'x 536, 540 (3d Cir. 2011); 29 C.F.R. § 1630.2(n)(1).

particular function.'"[51] And as 29 C.F.R. § 1630.2(n)(2) details, these rationales may be evidenced by:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the job; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

As an employee in the frozen foods department, Bletz's overarching tasks were to assist customers on the floor and to stock the store's freezer department. The latter entailed taking items kept in the large freezer in the back of the store and then placing the individual items on the on the shelves in the frozen foods section.[52] Wegmans' position description provides:

> Work includes walking, standing for up to 4 hours without a break, frequent heavy lifting, repetitive hand and arm movements, bending, and reaching, along with continuous exposure to and work in below freezing temperatures. The average weight range of items lifted is 8–32 pounds with a maximum weight lifted of 50 pounds occasionally to frequently. May be exposed to various allergens (things that may cause an allergic reaction).[53]

---

[51]    *Id.* (quoting 29 C.F.R. § 1630.2(n)(2)).
[52]    Doc. 25-1 at 40:1–22; Doc. 25-2 at 31:8–32:2; Doc. 19-1 at 5.
[53]    Doc. 19-1 at 5.

In addition, the position description also details that the job requires "moderate" "upper extremity repetition" and the use of a "[b]ox cutter, u-cart, hand/power jack, compacter, [and] baler."[54]

Wegmans contends that these physical requirements are essential functions of the job. But listing a requirement in a position description does not automatically make it essential under 29 C.F.R. § 1630.2(n). Now, that a position description sets out requirements—particularly when coupled with proof that it was "prepared before advertising or interviewing applicants for the job"[55]—is certainly evidence of its essentialness; still that alone is not necessarily enough.[56] As much is made clear by the case that Wegmans itself relies on its briefing: *Miller v. Coca-Cola Refreshments USA*.[57] There, the employer's periodic 50-plus pound lifting requirement was supported by testimony that details what might need to be lifted that actually weighs that much, when the employee might need to do it, and why.[58]

Wegmans, by contrast, provides no such support for its lifting requirement. At a basic level, it highlights no evidence showing that it used the position description to advertise the job or interview the applicants.[59] But beyond that,

---

[54]   *Id.*
[55]   29 C.F.R. § 1630.2(n)(2)(ii).
[56]   *See Turner v. Hershey Chocolate USA¸*440 F.3d 604, 612 (3d Cir. 2006) (quoting *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998) (en banc)) (internal alternations omitted) ("Whether a particular function is essential 'is a factual determination that must be made on a case by case basis based upon *all* relevant evidence.'").
[57]   2018 WL 1456502 (W.D. Pa. Mar. 23, 2018).
[58]   *Id.* at *13.
[59]   *See* Doc. 19-1 at 5.

Wegmans does not detail what is being lifting in the 50 or 8–32 pound range; nor does it describe what the various tools—the box-cutter, u-cart, hand/power jack, compactor, and baler—are used for.[60] Indeed, after parsing the record, I am left without an understanding of what a Wegmans frozen foods worker even does in the back freezer. Presumably they are breaking down large, heavy packages of food so that they can be stocked one-by-one. But Wegmans has failed to paint a picture.

While Wegmans has failed to carry its burden on the essentialness of the lifting requirement, there nevertheless remains ample evidence that stocking the freezers in the frozen foods section is an essential function. And even if I consider only the actions required to do so, no reasonable juror could conclude that Bletz could perform this task. Indeed, Bletz acknowledged as much in her deposition.

To start, she stated that she sought an accommodation after her initial doctor's appointment in January 2018 because "[she] couldn't do the overhead lifting that [her] job required in the Frozen Department,"[61] and while she might have been able to perform a different task, as "[her] limitation was only on [her] left side, . . . it was hard to stock with one arm."[62] And she reiterated this same point when asked directly:

> Q.    So what accommodation did you need to perform the essential functions of your job at Wegmans?

---

[60]    *See id.*
[61]    Doc. 25-1 at 59:20–22.
[62]    *Id.* at 60:19–21.

A.    I wasn't able to lift with my left arm and I was not able to go overhead, which was the only function in the Frozen that was a problem, was lifting and going overhead with my shoulder.

Q.    Could you do the job in Frozen without lifting or going over your head?

A.    Not efficiently. I did mention to them about, you know, I could do the lower shelves and, you know, they laughed. I did attempt[.]

. . . .

Q.    So would you agree you couldn't with that limitation perform the frozen foods job?

. . . .

[A.]    No, I couldn't perform the Frozen Food job.[63]

And these statements are only reaffirmed by her own description of her injury earlier in her deposition—and indeed, they paint an even more severe picture:

Q.    How did [your shoulder injury] substantially limit your ability to perform manual tasks?

A.    Because I could only lift my arms so far.

Q.    So how far could you lift it?

A.    I could not lift it up to shoulder length. I would be in extreme pain even reaching over to pet my dog.

Q.    And how long did that last?

A.    Until I had surgery.

. . . .

Q.    The next one is lifting. How did it impact your ability to lift?

---

[63]    *Id.* at 71:16–72:17 (counsel's objection omitted).

A.     Again, I could not raise my arm, uhm, not—not even halfway to my shoulder, you know level. Uhm, picking up anything it would be very painful.

Q.     So when you saying "picking up anything" do you mean something like picking up a pen?

A.     A pen I was okay, but picking up, you know, a large—anything heavier.

Q.     Anything heavier than what?

A.     I couldn't pick up boxes of things. I couldn't pick up heavy dishes. Uhm, as long as I wasn't—if I only used my forearm and my elbow I was okay, but I could not—then that did not involve my shoulder.

Q.     You mentioned dishes. Could you lift one dish?

A.     Depending upon the size.

Q.     Depending on the size, yes?

A.     Yes, depending on the size.

Q.     But anything requiring you to use the strength from your shoulder or above your elbow you couldn't do?

A.     Correct.

Q.     How long did that limitation last?

A.     After my surgery it didn't take too long to bounce back after that.[64]

Finally, if there can be any doubt, her doctor's notes further back her inability to do the essential functions of her job. Her first, in late January, provides, "No lifting with L arm at this point. MRI has been ordered to further evaluate her shoulder injury."[65] The second, in mid-February, similarly states, "No lifting with L arm at

---

[64]   Doc. 54 at 54:17–57:20.
[65]   Doc. 19-3 at 2.

this point. Her evaluation and treatment continues. She will be seen again in 3 weeks."[66] A third note, from early March, comments, "Patient is unable to return to work. She will follow up in 6 weeks."[67] And a final note, from just over a week later, conveys that Bletz could not lift 50 pounds, could not lift 8–32 pound occasionally to frequently, could not use a box-cutter, u-cart, hand/power jack, compactor, or baler, and could only do minimal upper extremity repetition—with none overhead.[68]

The remaining question, then, is whether she could have performed these tasks, given her limitations, with a reasonable accommodation. As provided by 29 C.F.R. § 16320(o)(2)(ii), a "reasonable accommodation" may include "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices . . . and other similar accommodations for individuals with disabilities." At this stage, an employee "bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits."[69] Summary judgment is nonetheless appropriate if the "proposal is either clearly ineffective or outlandishly costly."[70] For instance, courts in this Circuit have determined that employers are "not required to reallocate job functions that change the essential functions of the job";[71] they are not required

---

[66] Doc. 19-5 at 2.
[67] Doc. 19-6 at 2.
[68] Doc. 19-7 at 2–3.
[69] *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d Cir. 1999) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 136–37 (2d Cir. 1995)).
[70] *Id.*
[71] *Provenzano*, 2004 WL 1146653, at *3.

- 15 -

to "temporarily assign[] a second person to work with [the employee];[72] and they are not required to "create a 'light duty' or new permanent position."[73]

Bletz presents three accommodations here. But none are reasonable. First, she contends that Wegmans could have reassigned the task of stocking the overhead shelves she couldn't reach to another employee or instead allowed her to work throughout the store.[74] Yet a no-high-shelves or roving-helper position would require Wegmans to eliminate an essential function of the job—fully stocking the frozen foods section—and create either a light duty position that shifts additional responsibilities onto a second employee or new position entirely. Our disability discrimination laws require no such thing.[75]

Second, she claims—for the first time in her opposition brief—that she could have completed the overhead stocking tasks if she had been provided a step-up work platform or a stepstool.[76] But Bletz's belated argument on this front is, similarly, a non-starter: only an imprudent employer puts an employee with limited use of an arm atop a structure. Far from a reasonable accommodation, this suggestion is a worker's compensation claim in waiting.

---

[72]  *Blackwell v. Philadelphia*, 2000 WL 572706, at *3 (E.D. Pa. May 10, 2000).

[73]  *Id.*; *see also Hosier v. Nicholson*, 2006 WL 2816604, at *9 (M.D. Pa. Sept. 28, 2006).

[74]  Doc. 23 at 11. Given the focus on the repetitive upper body movement required to stock the higher shelves because Wegmans had not shown, at this summary judgment stage, that lifting was an essential function of the position, Bletz's invocation of the lifting limitations waived for a line cook are immaterial. *See* Doc. 23 at 11; Doc. 25 ¶¶ 75–78.

[75]  *Provenzano*, 2004 WL 1146653, at *3; *Blackwell*, 2000 WL 572706, at *3

[76]  *Id.*

And third, she argues that she could have been transferred to an existing position that fit her physical limitations.[77] Still, Bletz has failed to uncover evidence that there was an open position that fit her limitations. While an employee in pricing had given her two weeks' notice before Bletz resigned, the undisputed facts show that this position was not vacated until a week after Bletz was gone. And Bletz provides no other evidence of open positions at the store that she could perform.

## IV.   CONCLUSION

Even when the facts are considered in the light most favorable to Bletz—taking her at her word that she was only unable to lift overhead with her left arms, despite doctor's notes showing that she should not lift with her left arm at all and her own testimony that she couldn't reach over to pet her dog without pain nor could she even lift heavy dishes—no reasonable juror could find Bletz capable of performing the essential functions of the frozen foods position. And just the same, no reasonable juror could find that her proposed accommodations were reasonable. The modifications she suggests are either unsafe or require the creation of a new position that imposes burdens on another employee; and she has gathered no evidence showing that there was open position that fit her limitations. Wegmans' motion for summary judgment is therefore granted.

---

[77]   *Id.*

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge